Filed 6/5/26  Mejia v. Gurvits CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CHONA MEJIA et al., | |
| Plaintiffs and Appellants, | E083293 |
| v. | (Super.Ct.No. CVRI2105631) |
| VADIM GURVITS D.O. et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Erica A. Keen, Judge.

Affirmed.

Chona Mejia and James Mejia, in pro. per., for Plaintiffs and Appellants.

Davis, Grass, Goldstein & Finlay and Gabriel M. Benrubi for Defendants and Respondents.

1

In this medical malpractice action, plaintiffs Chona and James Mejia appeal from the summary judgment entered in favor of defendants Vadim Gurvits, D.O.; Abigail Baker, N.P.; and Britanny Travis, M.A.[1]  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Plantiffs' Lawsuit*

Plaintiffs represented themselves in the trial court, as they do on appeal.  In the operative complaint, the Second Amended Complaint (SAC), Chona asserted three causes of action—(1) medical negligence against all three defendants; (2) medical negligence against Baker; and (3) negligent hiring and supervision against Dr. Gurvits— and James asserted a claim for loss of consortium.[2]

To support her claims, Chona alleged the following:  She was a patient of Dr. Gurvits at his practices of Premier Family Care and Premier Urgent Care from 2018 through April 2021.  She suffered from hyperthyroidism, but Dr. Gurvits misdiagnosed her with hypothyroidism and wrongly prescribed a non FDA-approved medication called Armour Thyroid to address the misdiagnosed hypothyroidism.  Dr. Gurvits first prescribed the Armour Thyroid medication in June 2019.  In August 2019, Dr. Gurvits instructed Chona to reduce her dosage by half.  In February 2020, after she had been taking the medication for eight months, Dr. Gurvits advised her to stop taking it

---

[1] Because they share a last name, we use the Mejias' first names when referring to them individually.  No disrespect is intended.

[2] In response to defendants' demurrer, the trial court dismissed Chona's claim of fraud against all three defendants.

altogether. For the next 14 months, Chona received no thyroid treatment from Dr. Gurvits. Then, in May 2021, she saw an endocrinologist who diagnosed her with "grave[s'] disease/hyperthyroidism" and prescribed the FDA-approved drug Methimazole.

Chona alleged that Dr. Gurvits was negligent for failing to detect her hyperthyroidism and prescribing Armour Thyroid, that Baker (Dr. Gurvits's nurse practitioner) was negligent for refilling the prescription, and that Travis (Dr. Gurvits's medical assistant) was negligent for telling her that "Armour Thyroid is for *hypothyroidism* and *hyperthyroidism* and will go away without treatment." Chona alleged that defendants were the "proximate cause" of her "harm, past damages, and future damages." She alleged that "if Dr. Gurvits did not abandon my thyroid treatment, I would have obtained a better result, or as an alternative, if he had timely referred me to an endocrinologist, this lawsuit would not have been filed."

To support his claim, James alleged that he "suffered a loss of consortium" due to "the damage suffered by" Chona.

Plaintiffs did not allege in the SAC the particular damages or injuries the defendants caused. They alleged: "[We] sent Dr. Gurvits [a] notice of intent and statement of claims [and were] willing to settle with him and with . . . insurance [but] to no avail; that is why we filed this lawsuit."

B. *Defendants' Summary Judgment Motion*

Defendants filed a motion for summary judgment, arguing that they did not breach the standard of care when treating Chona's thyroid condition and did not cause her to

3

suffer any injuries. Dr. Gurvits, the principal and medical director of Premier Family Care and Premier Urgent Care, filed a declaration in support of the motion, stating that he first saw Chona in May 2018 and she became his primary care patient in December 2018. He explained that he initially prescribed Armour Thyroid for Chona because the "clinical and laboratory evidence" suggested a hypoactive thyroid, but when "subsequent lab values . . . showed hyperactive thyroid changes," he reduced and later stopped the medication. In support of his plan for treatment, Dr. Gurvits attached to his declaration Chona's medical records and his progress notes.

Dr. Gurvits also provided the following summary of Chona's medical care. She first visited him on May 29, 2018, at Premier Urgent Care, complaining of neck and shoulder pain, joint pain that existed off and on for several months, and chronic vertigo and fatigue. He assessed her with cervical pain and radiculopathy, right rotator cuff tendonitis, degenerative joint disease of the cervical spine, and fatigue. Her lab studies revealed that she had uncontrolled type 2 diabetes, as well as what Dr. Gurvits believed to be "suboptimal" thyroid functioning. Specifically, her "free T3" value was in the low range (at 3.7), as was her "free T4" value (at 1.4).

In December 2018, when Chona became Dr. Gurvits's primary care patient, she completed an intake form and a hormone checklist for women, in which she complained of mild fatigue, mild memory loss, mild dry and wrinkled skin, moderate hair loss, and constantly feeling cold. Her next set of lab studies, taken in January 2019, revealed elevated blood glucose and hemoglobin AIC values, indicating "an ongoing problem with diabetes."

In May 2019, Chona saw Dr. Gurvits, complaining of heart palpitations, which she said had been occurring off and on for at least a year, beginning around the same time that she started menopause. The results of her physical examination, as well as various heart tests, were normal, but Dr. Gurvits referred her to a cardiologist for additional assessment.

Chona's next set of lab studies, taken in June 2019, again indicated suboptimal thyroid functioning. Her "TSH" level was 1.86, and both her free T3 and free T4 values were lower than they had been the previous year. (Her free T3 had reduced from 3.7 to 3.2, and her free T4 had reduced from 1.4 to 1.2.) Dr. Gurvits believed that the "downward trend of the free T3 and free T4," in combination with her "reported history of fatigue, memory loss, dry and wrinkled skin, loss of hair, and feeling cold," indicated that she had a hypothyroid condition. To address that condition, on June 5, 2019, he prescribed "Armour Thyroid 1.5 grain (90 mg) with 10 refills."

In July 2019, Dr. Gurvits referred Chona to a rheumatologist after her lab tests revealed "positive antinuclear antibodies," which could indicate an underlying autoimmune disease.

In August 2019, nurse practitioner Baker approved Chona's request for additional refills of Armour Thyroid at 90 mg. The following month, Chona attended a visit, complaining of dizziness and stomach pain. Her physical examination revealed that she had lost weight and had low blood pressure. Dr. Gurvits assessed her as having low blood pressure and instructed her to increase her water intake and stop taking her high blood pressure medication until he could analyze the results of follow-up lab studies.

5

Chona's next set of lab studies, taken in September 2019, revealed a low TSH of 0.005, elevated free T3 of 11.0, and elevated free T4 of 1.76. In response to the increase in free T3 and T4 values, Dr. Gurvits instructed her to reduce the Armour Thyroid dosage by half, to 45 mg per day.

In December 2019, Chona visited Premier Family Care with complaints of stomach and lower back pain. She reported that she was taking the reduced dosage of Armour Thyroid. Her physical examination was normal. She had not followed up with the cardiology referral Dr. Gurvits ordered in May 2019. Dr. Gurvits ordered spinal and abdominal x-rays and instructed her to discontinue caffeine and her blood pressure medication. When she returned about a week later for a follow-up appointment, she complained of intermittent stomach pain. Her physical examination was normal, and Dr. Gurvits assessed her with a history of lumbar pain and constipation, hypothyroidism, and type 2 diabetes. He instructed her to increase her water intake and add bran, fiber, and a stool softener into her daily routine. He also ordered follow-up lab studies.

Her next lab studies, taken in February 2020, revealed "continued elevation" of thyroid values, with her free T3 elevated at 15.5 and her free T4 elevated at 3.67. "On the basis of those results," Dr. Gurvits instructed her to stop taking Armour Thyroid. Nurse practitioner Baker relayed Dr. Gurvits's instructions to Chona on February 13, 2020 and directed her to return to the clinic "to discuss results and [a] treatment plan."

Chona's next visit was on June 1, 2020 and was telephonic because of the COVID-19 pandemic. She complained of a urinary tract infection. She also informed

Dr. Gurvits that she was still taking Armour Thyroid, against his earlier advice. He ordered lab studies and again instructed her to stop taking the Armour Thyroid.

The next time Chona visited Dr. Gurvits was in October 2020 for her annual physical exam. She reported significant weight loss, as well as intermittent pain and stiffness in her hands and shoulder that had lasted for months. Her physical examination results were normal, but because of her weight loss, Dr. Gurvits became concerned that she was suffering from a hyperthyroid condition and ordered lab studies.

The results of her lab studies revealed that she continued to test positive for antinuclear antibodies and that her free T3 and T4 levels continued to be elevated (at 9.1 and 2.84 respectively). As a result, on October 19, 2020, Dr. Gurvits ordered a referral to "an endocrinology consult regarding hyperthyroidism." On January 15, 2021, an endocrinology referral request was forwarded to her insurance for approval.

The defendants' medical expert, Dr. Bridget Briggs, submitted a declaration in support of the summary judgment motion. Dr. Briggs is board certified in family practice, as well as in holistic, integrative, and functional medicines. She owns The Briggs Institute of Epigenetic Medicine, where she provides a full-service family practice for patients ranging from children to senior adults. She specializes in bio-identical hormones, nutritional and dietary support, weight management, and integrative and functional medicine. She is therefore familiar with the integrative and functional medicine techniques Dr. Gurvits and his clinical staff use at Premier Urgent Care and Premier Family Care. She described functional medicine as a well-recognized holistic approach to medical care that seeks to address the root causes of a patient's symptoms.

7

To form her opinions, Dr. Briggs reviewed Chona's medical records, Dr. Gurvits's progress notes, and the declarations of Dr. Gurvits, Baker, and Travis. On the basis of that evidence, she concluded that Dr. Gurvits and his staff met the standard of care in treating Chona's thyroid condition and that they did not cause her to suffer any injury or damages.

Regarding the standard of care, she explained that Dr. Gurvits's initial prescription of 90 mg of Armour Thyroid (in June 2019) was reasonable and fell within the standard of care, given Chona's "lab values that showed . . . downward trending free T3 and free T4 values" and her "history of chronic fatigue, hair loss, memory problems, . . . skin changes and other symptoms." She also explained that it was reasonable for Dr. Gurvits to reduce the prescription when lab studies (in September 2019) showed elevated thyroid function levels and to stop the medication (in February 2020), when lab studies showed that those function levels continued to be elevated. Dr. Briggs concluded: "Dr. Gurvits met the standard of care by timely having [Chona] seen in follow up, timely ordering follow up lab testing, and timely and appropriately responding to [her] presentations during each office encounter, and . . . referring [her] to medical specialists in response to various changes in [her] complaints and presentation[s]."

As to injury, Dr. Briggs opined that Chona did not suffer any harm from taking the Armour Thyroid prescription and that her hyperthyroid condition was not caused by the medication. She explained that Armour Thyroid is "a natural thyroid replacement product that stays within the body for no longer than 48 to 72 hours" and leaves no lingering effects. She concluded that Chona's hyperthyroid condition and her underlying

8

auto-immune disease were "the natural result of [her] underlying medical condition that could and did occur, irrespective of any of the reasonable medical treatment provided" by defendants. Finally, she opined that Dr. Gurvits did not cause or exacerbate any of Chona's underlying conditions or symptoms by delaying thyroid treatment or by delaying referral to an endocrinologist.

Chona opposed the motion for summary judgment. In support, she filed a document purporting to be her own affidavit, but which did not satisfy the rules for affidavits or declarations under penalty of perjury set out in section 2015.5. In that document, Chona stated that she left Dr. Gurvits and changed her primary care physician in May 2021, "was referred to an endocrinologist, and was prescribed Methimazole for Graves' Disease due to hyperthyroidism." She said that her "body has significantly improved after taking the correct medication for Graves' Disease caused by hyperthyroidism" and that "[t]his lawsuit would not have been filed if I had been referred to a specialist and an endocrinologist sooner." She stated, "I just wanted my health to improve, be seen promptly with empathy, and enjoy the continuous relationship with a high-quality clinician I chose. They should give me exactly the help I need and want exactly when I need and want it." Chona did not certify that the statements in her affidavit were true under penalty of perjury. Instead, she had the document notarized, which certifies only that the notary's disclosures are true under penalty of perjury.

In a written ruling, the trial court overruled plaintiffs' objections to defendants' evidence, sustained defendants' objections to Chona's affidavit, and granted defendant's motion for summary judgment. The court concluded that defendants met their burden of

9

demonstrating that plaintiffs could not satisfy at least one element of each of their claims by presenting Dr. Briggs's expert opinion that defendants did not breach the standard of care and did not cause plaintiffs to suffer any injuries. The court further concluded that, because plaintiffs failed to "present their own competent medical expert testimony," they failed to demonstrate the existence of a triable issue of fact. Plaintiffs timely appealed.

DISCUSSION

On appeal, we presume the judgment is correct, and it is the appellant's burden to demonstrate reversible error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) California Rules of Court, rule 8.204(a)(1)(C) provides that each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." "The purpose of this rule is to enable appellate justices and staff attorneys to locate relevant portions of the record expeditiously." (*Alki Partners*, *LP v. DB Fund Services*, *LLC* (2016) 4 Cal.App.5th 574, 590 (*Alki*), citing *City of Lincoln* (2002) 102 Cal.App.4th 1211, 1239, fn. 16.) " '[A]n appellant must do more than assert error and leave it to the appellate court to search the record and the law books to test his claim. The appellant must present an adequate argument including citations to supporting authorities and to relevant portions of the record.' " (*Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162.) These rules apply to represented and self-represented litigants alike. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574; *Huang v. Hanks* (2018) 23 Cal.App.5th 179, 183 & fn. 1.)

Plaintiffs raise various arguments for reversing the trial court's grant of summary judgment, but their brief does not contain a factual summary or any record citations.[3] "By failing to support the factual assertions in their legal arguments with citations to the evidence, plaintiffs have forfeited their argument the court erred in granting summary judgment." (*Alki*, *supra*, 4 Cal.App.5th at p. 590, citing *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 [Arguments not supported by adequate citations to the record need not be considered on appeal.].) In reviewing a ruling on a motion for summary judgment, " 'de novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority.' " (*Alki*, at p. 590, quoting *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116.)

Forfeiture aside, we have examined the record and conclude that the court properly entered summary judgment. "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar* ).)

---

[3] In addition, plaintiffs did not include in their appellants' appendix defendants' motion for summary judgment, the briefs and evidence defendants filed in support of their motion, or the trial court's ruling on the motion. We were able to summarize the factual and procedural background of this case because defendants included those documents in their respondents' appendix and provided a factual summary, with record citations, in their respondent's brief.

A defendant moving for summary judgment must show that one or more elements of the causes of action cannot be established or that there is a complete defense to the causes of action. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 849.) Once the defendant clears this initial hurdle, the burden shifts to the plaintiff to demonstrate a triable issue of material fact. (*Aguilar*, at pp. 850-851.) The trial court may grant the motion if there is no triable issue of material fact and the issues raised by the pleadings may be decided as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 813.) We review the court's summary adjudication and summary judgment orders de novo and apply the same standard as the trial court. (*Travelers Property Casualty Co. of America v. Superior Court* (2013) 215 Cal.App.4th 561, 574.)

To succeed on a claim of professional negligence, the plaintiff must show, among other things, the defendant breached the standard of care required of other members of the profession and the breach caused the plaintiff to suffer harm. (*Giacometti v. Aulla, LLC* (2010) 187 Cal.App.4th 1133, 1137 [There must be "a causal connection between the negligent conduct and the resulting injury."].) In the medical malpractice context, "causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case." (*Jones v. Ortho Pharm. Corp.* (1985) 163 Cal.App.3d 396, 402.)

"The standard of care in a medical malpractice case requires that physicians exercise in diagnosis and treatment that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession under similar

circumstances." (*Munro v. Regents of Univ. of Cal.* (1989) 215 Cal.App.3d 977, 983-984 (*Munro*).) " 'Expert evidence in a malpractice suit is conclusive as to the proof of the prevailing standard of skill and learning in the locality and of the propriety of particular conduct by the practitioner in particular instances because such standard and skill is not a matter of general knowledge and can only be supplied by expert testimony.' " (*Willard v. Hagemeister* (1981) 121 Cal.App.3d 406, 412.) "The question remains one of fact, to be decided on the basis of expert testimony: 'The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony.' " (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410.) Thus, " '[w]hen a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment *unless the plaintiff comes forward with conflicting expert evidence*.' " (*Munro*, at p. 985, italics added.)

Defendants were entitled to summary judgment in this case. They supported their motion with admissible evidence, including an expert declaration opining that their conduct fell within the standard of care. Dr. Gurvits detailed the medical care he provided to Chona to treat what he believed to be a low functioning thyroid, as well as the steps he took to respond to elevations in Chona's thyroid functioning. Dr. Briggs opined that Dr. Gurvits's decision to prescribe Armour Thyroid and later to taper and ultimately discontinue the medication was reasonable and fell within the community standard of care for functional medicine, given Chona's symptoms and the results of her

13

lab studies. That plaintiffs failed to present any admissible evidence in rebuttal, let alone an admissible expert declaration opining that defendants breached the standard of care, compelled summary judgment in defendants' favor. (*Munro*, *supra*, 215 Cal.App.3d at p. 985.)

The failure to produce an opposing expert opinion is reason alone to grant summary judgment. However, we also note that plaintiffs' claims fail for the additional reason that they did not allege any damages or injuries that they suffered from the alleged acts or omissions of defendants. Chona's belief that she did not receive "exactly the help I need and want exactly when I need and want it" is not a legally cognizable injury, nor is her belief that her results would have been "better" if she had been treated for hyperthyroidism sooner.

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:

McKINSTER _____
Acting P. J.

MILLER _____
J.

14